**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| VAUGHN COOPER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>PHOTRONICS, INC.,<br>GEORGE C. MACRICOSTAS,<br>ERIC RIVERA, and KANGJYH LEE<br><br>Defendants. | Case No. 3:26-cv-1069<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Vaughn Cooper ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Photronics, Inc. ("Photronics" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Photronics' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Photronics securities between December 10, 2025, to May 27, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2. Defendants provided investors with material information concerning Photronics' expected revenue for the first quarter of fiscal year 2026 and provided growth expectations for its high-end integrated circuit ("IC") photomask product line. Defendants' statements included, among other things, confidence in allegedly robust global order patterns, emphasizing Photronics' position as the "only U.S. headquartered company that can produce trusted masks," with the "only commercial high-end U.S. trusted mask facility," positioning the Company to implement strategic capacity expansions to aggressively capitalize on the claimed "growing high-end demand" for Photronics' product, while minimizing risks associated with mainstream market headwinds and the aggressive mix-shift toward the high-end market.

3. Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Photronics' high-end product pipeline, customer schedules, and the stability of the alleged demand for its products; notably, that the seasonal recovery and design release momentum following the Chinese New Year holiday the Company was claiming would develop had stalled. Photronics was experiencing a critical bottleneck in its design release pipeline that rendered its forward growth expectations unachievable. Such statements absent these material facts caused Plaintiff and other shareholders to purchase Photronics' securities at artificially inflated prices.

4.      On May 28, 2026, Photronics announced its financial results for the second quarter of fiscal 2026, revealing revenue and earnings well-below internal projections and highlighting a critical collapse of IC revenue by 11% sequentially. Management further provided third-quarter guidance below market consensus as the slowdown was expected to continue and margins were expected to continue their trend of compression. Management claimed that the projected seasonal recovery following the Chinese New Year holiday had failed to materialize due to extensive new product launch delays, elevated fab utilization rates, and geopolitical uncertainty.

5.      Investors and analysts reacted immediately to Photronics' revelation. The price of Photronics' common stock declined dramatically. From a closing market price of $53.51 per share on May 27, 2026, Photronics' stock price fell to $34.02 per share on May 28, 2026, a decline of about 36.42% in the span of just a single day.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Photronics is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.    Plaintiff purchased Photronics common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in Photronics is attached hereto.

12.    Photronics, Inc. is a Connecticut corporation with its principal executive offices located at 15 Secor Road, Brookfield, CT 06804. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "PLAB."

13.    Defendant George C. Macricostas ("Macricostas") was, at all relevant times, the Chief Executive Officer and Executive Chairman of Photronics.

14.    Defendant Eric Rivera ("Rivera") was, at all relevant times, the Chief Financial Officer, Vice President, and Corporate Controller of Photronics. Defendant Rivera was also the Principal Accounting Officer of Photronics until January 12, 2026. From January 12, 2026, through the end of the Class Period Defendant Rivera served as the President of Photronics.

15.    Defendant KangJyh Lee ("Lee") was, at all relevant times, the President of PDMC and a Director of Photronics.

16.    Defendants Macricostas, Rivera, and Lee are sometimes referred to herein as the "Individual Defendants." Photronics together with the Individual Defendants are referred to herein as the "Defendants."

4

17.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Photronics' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.    Photronics is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Photronics under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.    Photronics is a global manufacturer of photomasks, which are microscopic circuit patterns contained on very precise glass or quartz plates. These photomasks are a necessary element in the manufacturing of integrated circuits ("ICs") and flat panel displays ("FPDs").

21.    "High-end" photomasks are a subset of photomasks that support smaller design nodes, at or under 28 nanometers. The "mainstream" photomasks that support over 32 and above nanometers represent the majority of designs being fabricated in volume.

### The Defendants Materially Misled Investors Concerning
### Photronics' High-End IC Growth Potential

#### December 10, 2025

22.    On December 10, 2025, Defendants issued a press release announcing fourth quarter and full year results for fiscal 2025. In pertinent part, Defendants announced "IC revenue was $157.4 million, down 4% year-over-year and up 7% sequentially."

23.    Defendants further issued guidance for the first quarter of fiscal 2026, anticipating "Revenue to be between $217 million and $225 million and non-GAAP Net income attributable to Photronics, Inc. shareholders to be between $0.51 and $0.59 per diluted share."

24.    An earnings call was conducted the same day. On the call, Defendant Macricostas touted Photronics' "strong financial results" with sales "exceeding expectations." In pertinent part, he highlighted the Company's positive developments as follows:

> During the quarter, we achieved several positive technical and commercial developments. To highlight a few, one, we are recognizing more outsourced opportunities from captive mask makers, including leading-edge DRAM and logic nodes. Two, in advanced IC packaging, we saw increased demand for our larger-format masks that support AI-driven chip packaging applications.

> Three, we completed shipments of masks fabricated with our newest generation DRAM node mask process co-developed with a key memory customer. Four, demand tied to edge AI applications continues to rise across Asia, highlighting our exposure to this critical segment. And finally, *our advanced multi-beam mask writer we installed in the U.S. earlier in 2025 is now in full production, with over 20 customers qualified, including multiple EUV users.*

(Emphasis added).

25.     Defendant Macricostas further praised the Company's IC segment performance,

stating, in pertinent part:

> *Many of our high-end customers are providing positive forecasts that reinforce favorable node migration trends and global manufacturing regionalization*. While *the high end of the market remains robust*, the mainstream IC market remains soft, though appears to be stabilized.
>
> Returning to our quarterly results, *IC revenue was $157 million. We achieved a quarterly record in high-end IC, representing 42% of IC revenue, thanks to a strong technology portfolio and exceptional execution*. Demand in the U.S. has been particularly strong, validating our expansion initiatives designed to bring additional advanced production capacity to the market.
>
> As a reminder, *we are the only U.S. headquartered company that can produce trusted masks*, and our Boise facility is the *only commercial high-end U.S. trusted mask facility*.

(Emphasis added).

26.     Defendant Rivera further elaborated on the positive mix shift in the IC segment,

pertinently providing the following details:

> Fourth quarter revenue exceeded expectations at $216 million, increasing 3% sequentially, though declining 3% year-over-year. IC revenue of $157 million declined 4% year-over-year. However, *we experienced a meaningful mix shift towards high-end shipments, which reached record levels in both absolute dollars and as a percentage of total IC revenue at 42%.*
>
> *High-end IC strength reflects strong order patterns globally, including in the U.S., which now represent 20% of total revenue, where reshoring efforts continue to create a favorable demand environment.*
>
> Meanwhile, our mainstream IC revenue declined 12% year-over-year due to several factors. The declines are broad-based geographically because of market conditions. However, the mainstream IC decline deepened by recent geopolitical impacts across mainstream customer segments, primarily in China.
>
> . . .
>
> *Gross margin improved to 35%, exceeding expectations, driven by a favorable product mix*. Operating margin of 24% also exceeded our guidance range. Diluted GAAP EPS attributable to Photronics shareholders was $1.07 per share.

(Emphasis added).

27.    Defendant Rivera then closed out the Defendant's prepared remarks on the call by reiterating the Company's first quarter 2026 guidance, in pertinent part:

> Given current market conditions and the industry outlook George discussed, we expect fiscal Q1 revenue to be in the range of $217 million and $225 million. Based on those revenue expectations and our operating model, we estimate fiscal Q1 operating margin between 23% and 25% and non-GAAP diluted EPS between $0.51 and $0.59 per share.

28.    During the question-and-answer segment of the call, Defendants confidently praised their competitive position in the high-end IC market during the following pertinent exchanges:

> <Q: Linda Umwali – D. A. Davidson & Co. – Research Associate> Okay. Yes. So my first question was on market share. So with your largest competitor being public now, I was wondering how you're viewing your relative size and trends in the market share versus your competitor?
>
> <A: Eric Rivera> So our market share -- thank you, Linda. This is Eric. So we see the market share being as we had perceived in the past, the fact that [ TECHSEM ] now is public helps us get a little bit more detail, but we see our market share being exactly what we thought before.
>
> NIC, they have a little bit more -- they have more market share than we do for sure. When you consider our FPD business that they don't participate in, we're about the same size when you combine them.
>
> <Q: Linda Umwali> So same size on FPD and different elsewhere?
>
> <A: Eric Rivera> So [ TECHSEM ] doesn't participate in FPD, Photronics does. Tech is larger -- has a larger market share than Photronics does -- NIC. However, when you consider our FPD business, we're around the same size.
>
> <Q: Linda Umwali> Okay. Got it. And then looking at the overall competitive environment, what is your view on the overall health of the environment? Yes, any comment there would be helpful.
>
> <A: KangJyh Lee> Yes. ***We are seeing a lot of low migration and -- especially in the States.*** In the past, we have our major operation facilities in Asia. But right now, with the inshoring of semiconductor industry in the United States, ***our Boise side,***

*which has the high-end capability, we are the only high-end merchant [ mask ] supplier in the country.*

And *with all the growing high-end demand in the country, we believe we are on the right track to capture more high-end shares*. So this also answers your first question that our market share with the growing U.S. demand, especially in the high-end and trusted product, we believe our market share will continue to increase.

. . .

<Q: Linda Umwali> That makes sense. And then I also wanted to touch on the mainstream business. You said that there is a continued softness there, but you're seeing it stabilizing. Just curious if you're seeing any kind of -- basically what you're seeing on the supply and demand side of things and how that has impacted margins and maybe how that is impacting your capital spend for next year?

<A: KangJyh Lee> Our mainstream market, we are referring to mainly our mainstream business in China. As most people are aware that in China, due to the geopolitical issue, they do have some met in China policy. So there are quite a few new local [ mask ] house in China.

However, *Photronics as a market and technology leader in China, we try to differentiate ourselves from our local competitors. We are focusing more on our anchor key customers*. We build relationship with this key customer with better product quality, support and so on. And also, *we utilize our capacity better mainly for a more higher-value product mix.*

So *I think there are some competition in the mainstream, especially the low end of the mainstream. But with our capability and also with our tour capacity and so on, we are moving ourselves to higher-value product mix*.

(Emphasis added).

### *January 13, 2026*

29.     On January 13, 2026, Photronics issued a press release announcing that Defendant Rivera would be relinquishing the role of Chief Accounting Officer of Photronics and had been appointed President of Photronics, both of which became effective January 12, 2026

### *February 25, 2026*

30.     On February 25, 2026, Defendants issued a press release reporting Photronics' first quarter fiscal 2026 results. In pertinent part, Defendants announced that "[r]evenue was $225.1

9

million, up 6.1% year-over-year and up 4.3% sequentially" and specifically "IC revenue was $165.3 million, an increase of 7% year-over-year and up 5% sequentially."

31.    On February 27, 2026, Defendants conducted the corresponding earnings call. Defendant Macricostas opened the call praising Photronics' high-end IC business achieving its "second consecutive quarterly record," and forecasting that "high-end strength will continue," stating, in pertinent part:

> Accelerating demand during fiscal Q4 continued throughout fiscal Q1 with *sales increasing 4% sequentially to $225 million, exceeding expectations*. We executed on the *robust high-end demand in Asia ahead of Chinese New Year, propelling our high-end IC business to a second consecutive quarterly record*. Revenue and gross margin strength contributed to GAAP diluted EPS of $0.74 and non-GAAP diluted EPS above expectations at $0.61 per share.
>
> Over the past 9 months since stepping into the CEO role, I have prioritized strengthening our operating efficiency. While I'm not sharing specific metrics today, we have been making pinpoint actions to drive continuous improvement. We are executing with urgency and discipline to continue to elevate quality, improve yield, accelerate cycle times and enhance customer experience. *We're optimistic that our improved operational performance will drive higher revenue and continued market share gains as the industry demand expands*.
>
> *In our IC business, revenue of $165 million increased 7% year-over-year with our high-end business growing 19%. We continue to recognize growth for masks* that support exciting areas such as AI-driven chip packaging applications and masks for high NA, EUV development projects. *We believe the high-end strength will continue, as order demand remains healthy, to partially mitigate the upcoming seasonal impact following Chinese New Year*. As we leverage our global footprint and strengthen sales leadership, we are sharpening our focus on high-end opportunities that advance our node migration strategy while broadening our geographic diversification.

(Emphasis added).

32.    Defendant Rivera echoed Defendant Macricostas' comments, highlighting the "strong demand" for its high-end IC business, stating, in pertinent part:

> First quarter revenue exceeded expectations at $225 million, increasing 4% sequentially and 6% year-over-year. *IC revenue of $165 million increased 7% year-over-year. We achieved record high-end IC revenue of $71 million, an*

10

*increase of 19%. Strength in Asia accelerated, leading up to Chinese New Year, where we have strategically emphasized high-end opportunities*. Revenue in the U.S. increased slightly year-over-year, and *we expect the U.S. to be a contributor to revenue growth over the coming year*. Mainstream IC revenue was flat year-over-year at $94 million.

. . .

*Gross margin was at the high end of expectations at 35% as we benefited from higher revenue levels and a greater mix of high-end IC revenue*, which combined to drive up our operating leverage. Operating margin was 24%. Diluted GAAP EPS attributable to Photronics shareholders was $0.74 per share. Excluding foreign exchange impacts, non-GAAP diluted EPS was $0.61 per share. Our earnings to shareholders in the quarter reflected the strong demand in Asia leading up to Chinese New Year. We also achieved the second highest quarter of operating cash flow in the company's history at $97 million, equating to 43% of revenue. CapEx was $48 million, which primarily consisted of equipment to further extend our technical leadership in FPD.

(Emphasis added).

33.   In their quarterly release, Defendants also issued guidance for the second quarter, projecting revenue "between $212 million and $220 million and non-GAAP diluted earnings per share attributable to Photronics, Inc. shareholders to be between $0.49 and $0.55 per share.

34.   During the subsequent earnings call, Defendant Rivera reiterated this guidance, providing, in pertinent part:

For 2026, we will continue to emphasize internal investments to drive future revenue and earnings growth. Before providing guidance, I'd like to remind you that *demand for our products is inherently variable*. Visibility is limited with typical backlog of only 1 to 3 weeks. *Additionally, high-end mask sets carry significantly higher ASPs, meaning even a small number of orders can materially influence revenue and earnings.* Demand is also affected by IC and display design activity and secondarily by wafer and panel capacity dynamics. *Given current market conditions and the seasonal impacts of Chinese New Year that George referenced, we expect fiscal Q2 revenue to be in the range of $212 million and $220 million. Based on those revenue expectations in our operating model, we estimate fiscal Q2 operating margin between 22% and 24% and non-GAAP diluted EPS between $0.49 and $0.55 per share.*

(Emphasis added).

11

35. During the question-and-answer segment that followed Defendants' prepared remarks during the call, Defendant Lee clarified the anticipated minor seasonal impact justifying management's guidance for the second quarter, in pertinent part:

<Q: Ben Taxdahl - This is Ben Taxdahl in for Christian Schwab. First thing -- or my first question is just with that slight sequential decrease in revenue and operating margin, is there anything else we should be thinking about besides the Chinese New Year? And then my follow-up to that would be, what are some things that need to happen to kind of hit that higher end of that guided range?

<A: KangJyh Lee> Yes. Christian, I think in this year, the Chinese New Year fell into middle of February. So most customers, especially the fab design house customers, they are taking the long holidays. So we do see the customer tape-out forecast will resume in the middle -- early of March. So *I believe we do have a lot of activity from the orders before the new year*. However, *because of the temporary slowdown during the long holidays and the first week after the holiday, so there may be a slight impact on the output, and that's why our forecast is slightly lower than Q1.* Basically, no, *we don't see major difference in the market environment,* but the holiday did make some impact on our output.

(Emphasis added).

36. Continuing, Defendant Lee was asked how IC was expected to perform in the coming quarters following reportedly strong high-end IC revenue in the following pertinent exchanges:

<Q: Ben Taxdahl> Okay. Good context there. Now just with the Allen facility coming online and then just thinking about the high-end Boise facility and also kind of the high-end IC revenue these last 2 quarters, is there -- can you kind of talk about that? And then also maybe a little bit of a proxy for the high-end IC going forward? Is it going to be kind of continued at these same rates, these last 2 quarters? Or is it going to be lower or higher.

<A: KangJyh Lee> The Allen project, actually we kicked off the project several quarters ago in terms of planning the facility, clean room expansion and equipment purchasing. Right now, our clean room has been ready, and we have a tool delivered already. At this moment, we are in the process of installing the new equipment, which will be complete. And sequentially, we need to do certain customer qualification. So we believe once the qualification complete, Allen site will be able to contribute to our business, especially in the midrange of mainstream.

At the same time, Allen can support our Boise facility, take some middle or low-end mass layer away from Boise so we can spare the Boise capacity for the real high-end business. And *we see a lot of high-end opportunities, which we have to maximize our Boise capacity in terms of the product mix*. Also, I think both George and Eric report, we are going to do a lot of CapEx expansion, which *include Boise high-end capacity expansion to meet a strong high-end customer demand*.

. . .

<Q: Gowshihan Sriharan – Singular Research, LLC – Research Analyst> My first question is on the margins. You've been consistently printing kind of mid-30s even as mix improves. Do you think there's any risk that we are temporarily overearning here or because of unusually tight high-end supply? Or is that we should expect some more normalization as more capacity, including your own comes online over the next year or 2?

<A: Eric Rivera> Gowshi, this is Eric here. So *we don't see Q2 being much different than Q1 at the moment from a product mix perspective*. Of course, the market is going to determine that, but that's what we're expecting it to be similar. In terms of our CapEx that we are projecting, as I mentioned on our prepared remarks, we're entering a stage of elevated CapEx investments as a result of the opportunities the market is affording us, and we will certainly capitalize on them. With that comes increased depreciation, of course, when the tools are in place, but also revenue will increase for many of those projects. And those CapEx that are related to end-of-life tools, a lot of our end-of-life tools provide additional capabilities that will enable us to improve our product mix. So in general, I would say that although margins could surely fluctuate primarily because of product mix, we don't expect our margins to fall off a cliff.

. . .

actually, we do have a lot of high-end business. And as I just mentioned, we need to maximize our most advanced site, Boise, output. And that's one reason we need to have Allen site to take some loading away. At the same time, *to increase the capacity in Boise site, we are working with many customers to qualify a new writer called multi-beam writer. This writer has a much, much higher throughput, which can improve our overall diesel capacity*. So right now, it's not really so-called business constraint, it's actually a little bit capacity constraint. *So with the CapEx and also with the multi-beam qualification in Boise site, we will try to increase our high-end capacity*. And of course, the *high-end capacity will contribute greatly to the gross margin.*

<Q: Gowshihan Sriharan> Thanks for the color. And on the Asia side, in China, you said that it's kind of stabilized soft mainstream. Now it's been a couple of quarters. Are you seeing any the local competitors adjust their behavior or either moving up the node themselves or becoming aggressive on pricing in the segments?

Or are you -- is it still deemphasizing and could that change the economics of your stabilized soft mainstream outlook?

. . .

<A: Eric Rivera> No problem. So with respect to Asia and China specifically, I think *we're focused on the high end where there's less competition*. That's where we have a competitive advantage from the new entrants and the increased competition there. *They're more focused on the mainstream as they learn the business, if you will. So given our strategy, we see our margins relatively flat or slightly improving. It all depends on our product mix, but we're focused on the product mix on the high end, where there's less competition*. Frank, would you like to add something to that?

<A: KangJyh Lee> Sure, sure. I think in China market, even there are several, many newcomers, but because for customers, the high-end qualification require a lot of human resource, wafer resource from the wafer fab. So most of our high-end customers, they just have 1 or 2 suppliers. They are not really interested to spend a lot of resource to qualify #4, #5. And -- so we believe the entry barrier for the newcomers to the high-end business is very high. So for ourselves, Photronics, we do have a facility locally in Xiamen, and we are focusing on the high-end business in China. We have a business for major Chinese high-end wafer fab. *So we will continue to improve our cycle time, the delivery and so on and also to maximize our high-end product mix. So we believe the newcomers may have some negative impact on the mainstream. But on the high-end side, we do have a lot of advantages*.

(Emphasis added).

37.    The above statements in Paragraphs 22 to 36 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's projected revenue outlook and anticipated growth, while also minimizing risks from post-holiday seasonality and macroeconomic fluctuations. In truth, Photronics' optimistic reports of demand growth, high-end product mix, and improving margins fell short of reality; the Company's high-end chip design release pipeline was experiencing severe, ongoing bottlenecks due to elevated foundry utilization rates and equipment cost pressures.

*The Truth Emerges during Photronics' Second Quarter Earnings Report*

*May 28, 2026*

38.    On May 28, 2026, Defendants published a release announcing their second quarter results well below internal and external expectations pertinently as follows:

- Revenue was $209.9 million, down 0.5% year-over-year and down 6.7% sequentially.
- GAAP Net income attributable to Photronics, Inc. shareholders was $31.4 million, or $0.54 per diluted share, compared with $8.9 million, or $0.15 per diluted share, in the second quarter of 2025 and $42.9 million, or $0.74 per diluted share, in the first quarter of 2026.
- Non-GAAP Net income attributable to Photronics, Inc. shareholders was $24.9 million, or $0.42 per diluted share, compared with $24.3 million, or $0.40 per diluted share in the second quarter of 2025 and $35.7 million, or $0.61 per diluted share, in the first quarter of 2026.
- IC revenue was $147.5 million, a decrease of 5% year-over-year and a decrease of 11% sequentially.
- FPD revenue was $62.4 million, an increase of 13% year-over-year and an increase of 4% sequentially.

39.    Defendant Macricostas was quoted on the release, blaming the shortfall on "certain design releases [that] have been delayed due to elevated fab utilization rates, which are extending new product launch timelines, memory constraints and related cost pressures for OEMs and geopolitical uncertainty."

40.    During the corresponding earnings call, Defendant Macricostas attempted to smooth over the sharp slowdown in high-end wafer demand, pertinently stating the following:

> In Q2, global photomask dynamics reflected a mix of supportive long-term drivers alongside temporary headwinds. ***Industry demand for leading-edge memory and logic chips for AI applications remains exceptionally strong. Manufacturing these chips requires a significant number of high-end photomasks, which creates a compelling multiyear growth opportunity for Photronics***. We are taking several strategic actions to strengthen our position in this growing market, which I will discuss later in more detail.
>
> Importantly, as a reminder, photomask demand is more closely aligned with semiconductor design releases than to wafer starts. In the near-term, ***several factors have delayed design releases, including elevated fab utilization rates, memory supply constraints and geopolitical uncertainty***. Eric will further elaborate on

these factors. Given these unexpected near-term headwinds for certain chip design releases*, the seasonal recovery following Chinese New Year has not occurred to the extent anticipated.*

As a result, *our IC business decreased 5% year-over-year to $148 million, resulting in total fiscal Q2 revenue of $210 million, which was essentially flat year-over-year*.

. . .

Returning to IC, *while we are observing some signs of order recovery, near-term visibility regarding the timing of certain design releases remains limited*. For the medium- and long-term, secular demand trends remain positive, as highlighted at the beginning of my prepared remarks.

(Emphasis added).

41.     Defendant Rivera focused in on the financial details, largely parroting Macricosta's

explanation for the slowdown, in pertinent part:

*Second quarter revenue came in at $210 million, roughly flat year-over-year and down sequentially following the strong performance in fiscal Q1*, leading up to the Chinese New Year holiday. *IC revenue of $148 million represented 70% of total revenue. High end represented 38% of IC, while mainstream IC revenue was $91 million.*

Design releases and associated revenue, particularly from our foundry customers, were shaped by several factors during the period. *First, the semiconductor industry is currently experiencing higher-than-normal fab utilization rates. As a result, fabs have been unable to accommodate additional design releases from some of their customers because of this limited capacity.*

Additionally, m*any chip OEMs have prioritized revenue and profitability from existing products, which has led them to continue wafer production on current designs while delaying new releases.* Second, the recent *surge in memory prices and related supply constraints have contributed to delays in the launch of several new consumer electronic products* as OEMs have worked to secure memory supply and manage rising product costs.

The final factor contributing to delays for design releases is geopolitical developments, including the U.S.-Iran conflict, which have increased macroeconomic uncertainty.

(Emphasis added).

16

42.     Defendants further issued below-expectation guidance for the third quarter, as stated on the release, in pertinent part:

For the third quarter of fiscal 2026, Photronics expects:

- Revenue to be between $207 million and $215 million,
- Operating margin to be between 18% and 20%, and
- Non-GAAP diluted EPS attributable to Photronics, Inc. shareholders to be between $0.39 and $0.45 per share.

43.     Defendant Rivera reiterated Photronics' guidance for the third quarter during the earnings call as follows:

Given current market conditions and the influence of elevated AI demand on fab utilization and therefore, design starts, we expect fiscal Q3 revenue to be in the range of $207 million to $215 million. Based on those revenue expectations in our operating model, we estimate fiscal Q3 operating margin between 18% and 20% and non-GAAP diluted EPS between $0.39 and $0.45 per share.

44.     Notably the projected operating margin for the third quarter reflects a continued compression of the company's margins. As reported in the Company's consolidated income statements affixed to its third quarter release, Photronics' margins had already sequentially declined:

|  | Three Months Ended | | |
|---|---|---|---|
|  | May 3, 2026 | February 1, 2026 | May 4, 2025 |
|  | . . . | . . . | . . . |
| Operating Margin % | 20.1% | 24.4% | 26.4% |

45.     Defendants pertinently elaborated further on the slowdown and Photronics' updated going-forward expectations during the following pertinent exchanges:

<Q: Maxwell Scott Michaelis – Lake Street Capital Markets, LLC – Senior Research Analyst> First one from me. In terms of visibility, when did things really

start to get cloudy in the quarter, just given the guidance for Q2 came in a little bit below that. So really, when did visibility become cloudy in the quarter?

<A: Eric Rivera> Max, this is Eric. Thanks for the question. So it really started becoming cloudy *when the conflict* in -- with Iran and the U.S. *started during the quarter*. Then after that, we started seeing fab utilization was also affecting us.

. . .

<A: KangJyh Lee> Max, I'd like to comment more on this. Typically, we have a very strong booking before the Chinese New Year. And after Chinese New Year, there will be a temporary slowdown. So -- but this year, *the slowdown after Chinese is much longer than we anticipate*. Of course, the headwinds as George and Eric report -- highlight may be the factors causing this longer slowdown in the tape-out after Chinese New Year. So *we do see the slowdown right after Chinese New Year, which is in the end of February*.

<Q: Maxwell Scott Michaelis> End of February. Okay. And then I guess my second question and a follow-up to that would be when you're talking to your customers, I mean, have they given you any sort of rough time line on when they expect to bring in these new designs? Or they still have no idea either?

<A: KangJyh Lee> Our customers actually are still optimistic about the mid-term outlook. However, in the near-term, the visibility remains kind of limited. So *we see a lot of delay in the tape-out in Q2. However, at the beginning of Q3, we did see some recovery of those delay*. A lot of tape-out have happened since beginning of May. However, going forward, we remain very cautious. But at this moment, *customers are still optimistic about the mid-term outlook*.

. . .

<Q: Gowshihan Sriharan – Singular Research, LLC – Senior Analyst> Okay. I just wanted to get these customers that are deferring designs, are they -- were they already in the pipeline? Or is this more about new designs that are starting to slow down and do those recovery times differ?

<A: KangJyh Lee> Yes. Actually, they are -- whenever a customer make a new design, they tape-out the data to the foundry fab, then the foundry fab give the order to the mass house they select. This time, *the new design slowdown actually happened at the end of the foundry customer*, namely the design house. So the design house actually has a slower new tape-out -- new design release. *So it's not in the pipeline. It's at the very beginning of the new design release*.

<Q: Gowshihan Sriharan> Eric, on the margin compression side, are there any specific levers you guys can pull if the demand kind of stays soft for another couple

of quarters? Are there any variable cost reductions available? Or is it fundamentally a cost business that needs utilization to recover?

<A: Eric Rivera> Yes, **very little levers we can pull**. I mean it's really the product mix that will be available that the market gives us is what we'll have. Most of our cost is fixed or a big portion of it anyway is very fixed. So we don't have much levers to pull there.

(Emphasis added).

46.    The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during December 10, 2025, and February 27, 2026, earnings calls. On those calls, Defendants continually praised the Photronics' robust IC product mix, surging technical demand, and structural competitive advantages in the high-end market, while continually minimizing risks associated with post-holiday seasonality and the potential impact of foundry capacity constraints and macroeconomic uncertainty on the demand for the Company's product and its near-term profitability.

47.    Investors and analysts reacted immediately to Photronics' revelation. The price of Photronics' common stock declined dramatically. From a closing market price of $53.51 per share on May 27, 2026, Photronics' stock price fell to $34.02 per share on May 28, 2026, a decline of about 36.42% in the span of just a single day.

48.    A number of well-known analysts who had been following Photronics lowered their price targets in response to Photronics' disclosures. For example, Lake Street Capital Markets' analyst, Max Michaelis slashed their price target 20% to $44.  In pertinent part, the analyst highlighted the disappointing IC statistics, stating:

IC revenue of$147.5M declined 5% y/y and 11% q/q, impacted by delayed design releases across foundry customers and memory constraints. **High-end IC** represented approximately 38% of IC revenue ($56M) and **was down 21% q/q.**

19

(Emphasis added). The analyst went on to highlight declining margins, "reflecting product mix headwinds and lower fixed-cost absorption. Speaking to the disappointing margin guidance, Analyst Michaelis noted the "margin compression reflects rising depreciation from the Allen and Korea build-outs on a small revenue base."

49.    Similarly, Craig-Hallum reportedly cut its price target by 12.5% to $42. The firm pointed to disappointing second quarter results and soft third quarter guidance and highlighted softness in the IC division to justify its price target reduction.

50.    The fact that these analysts, and others, discussed Photronics' shortfall and below-expectation projections suggests the public placed significant weight on Photronics' prior revenue and margin estimates. The frequent, in-depth discussion of Photronics' IC shortfall confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

51.    During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Photronics were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning capacity constraints at customer foundries, knowledge of customer chip tape-out schedules, discussions concerning planned release delays of new chip product launches, ongoing customer discussions and concerns regarding memory supply constraints, and the general deceleration of high-end integrated circuit photomask orders

52.    Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Photronics was uniquely positioned to insulate itself from the broader industry

20

softness in the mainstream IC market by aggressively shifting its product shift toward the allegedly "growing," "healthy," and "robust" demand in the high-end IC market.

53.     Defendants did so while repeatedly minimizing their admitted short-term order visibility constraints, pointing to "positive forecasts" from Photronics's high-end customers," and claiming that "favorable node migration trends" and domestic reshoring efforts facilitated a healthy order pipeline into the second quarter of fiscal 2026. Moreover, Defendants repeatedly attempted to assuage investor concerns, highlighting that the combination of the high-end IC market's "robust" demand and the lack of competition. In fact, Defendants repeatedly emphasized throughout the class period that Photronics was "the only U.S. headquartered company" that has a "commercial high-end U.S. trusted mask facility" "that can produce trusted masks."

54.     Defendants' scienter is additionally evidenced by management's active concealment of operational headwinds they would have been tracking in their consumer base. Defendants' public emphasis on and boasting of purported developments, such as the "multi-beam writer," designed to facilitate Photronics' increased high-end capacity, omitted the risk and fact that elevated foundry utilization rates and OEM cost pressures were creating a systemic bottleneck, whereby customer fabs would be physically unable to accommodate new customer design tap-outs. This meant Photronics' claimed capacity expansion was functionally locked out from generating significant revenue growth as its consumer base was not in need of the "much higher throughput" advancements like the multi-beam writer could provide.

55.     Defendants' reckless disregard for the truth was further exposed by their claims of margin expansion into the second quarter. Management recklessly relied upon the above-referenced claims of increased high-end capacity to increase the product mix further toward the high-end IC business and ultimately improve Photronics' margins. Defendant Rivera was firm:

"we see our margins relatively flat or slightly improving. It all depends on our product mix." While this acknowledges some diversity in product mix, Defendants recklessly disregarded the potential for margins to continue to deteriorate.

56.     Finally, despite Defendant Lee admitting that visibility was an issue "when the conflict … with Iran and the U.S. started in the quarter," and that a "longer slowdown than anticipated" was seen "right after the Chinese New Year, which is in the end of February," Defendants made no effort to warn or otherwise caution the public of the risk of such developments occurring, let alone that they had already transpired. Rather than cautioning the market that their primary high-end catalysts were at risk of substantial slowdown, Defendants waited until the risks became reality and the core IC business had begun to falter as demand for the Company's high-end IC products failed to match the growth expectations Defendants touted to the investing public.

### *Loss Causation and Economic Loss*

57.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Photronics' common stock and operated as a fraud or deceit on Class Period purchasers of Photronics' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Photronics' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Photronics' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

58.     Photronics' stock price fell in response to the corrective event on May 28, 2026, as alleged *supra*. On May 28, 2026, Defendants disclosed information that was directly related to

their prior misrepresentations and material omissions concerning the Company's shift toward the high-end IC market, the level of competition and level of demand in that market, and its potential for revenue growth and margin expansion.

59.     In particular, on May 28, 2026, Photronics announced second-quarter financial results significantly below internal growth projections and external market consensus, including an 11% sequential collapse in the Company's core IC business segment. Photronics further issued third-quarter guidance that was similarly below consensus estimates and evidenced a projection for continued sequential margin compression.

### *Presumption of Reliance; Fraud-On-The-Market*

60.     At all relevant times, the market for Photronics' common stock was an efficient market for the following reasons, among others:

(a)     Photronics' common stock met the requirements for listing and was listed and actively traded on the NASDAQ during the Class Period, a highly efficient and automated market;

(b)     Photronics communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     Photronics was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about Photronics was reflected in and incorporated into the Company's stock price during the Class Period.

61.     As a result of the foregoing, the market for Photronics' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Photronics' stock price. Under these circumstances, all purchasers of Photronics' common stock during the Class Period suffered similar injury through their purchase of Photronics' common stock at artificially inflated prices, and a presumption of reliance applies.

62.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine

63.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue and margin projections while at the same time failing to maintain adequate forecasting processes or otherwise publicly disclose known headwinds to the high-end IC pipeline. Defendants did not appropriately risk to the public the potential for extensive new product launch delays, elevated fab utilization rates, or any other demand pressure related to customer efforts to "secure memory supply and managing rising product costs" stemming from the well-publicized memory shortage. Defendants ultimately provided the public with forecasts that failed to account for this potential waning demand and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

24

64.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

65.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Photronics who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Photronics' securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

67. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Photronics' common stock were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Photronics or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of March 5, 2026, there were 58.966 million shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

68. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

69. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

70. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Photronics;

(c)      whether the Individual Defendants caused Photronics to issue false and misleading financial statements during the Class Period;

(d)      whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)      whether the prices of Photronics' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)      whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

71.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Photronics common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Photronics' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

75.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for Photronics' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

76.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

77.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Photronics' internal affairs.

78.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Photronics' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements,

29

the market price of Photronics' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Photronics' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

79.     During the Class Period, Photronics' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Photronics' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Photronics' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Photronics' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

82.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Photronics' misstatements.

84.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Photronics which had become materially false or misleading.

85.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Photronics disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Photronics to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Photronics' common stock.

86.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Photronics to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87.     By reason of the above conduct, the Individual Defendants and/or Photronics are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 6, 2026

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Shannon L. Hopkins*
Shannon L. Hopkins
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel.: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com

-and-

Adam M. Apton (*pro hac vice* to be submitted)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 27th Floor
New York, NY 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*